UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____ x

Aleksandar Zunzurovski,

                Plaintiffs

-against-

Liane Fisher,
Michael J. Taubenfeld,
Fisher Taubenfeld, LLP,
John and Jane Doe 1-10, and
ABC Corp. 1-10.

                Defendants

Case Number 23-10881
Declaration of
Aleksandar Zunzurovski

_____ x

## Declaration of Aleksandar Zunzurovski

I, Aleksandar Zunzurovski, at this moment, declare according to 28 U.S.C. §1746 as follows:

1. I am the plaintiff in the above matter.
2. I have personal knowledge of the facts outlined in this Declaration.
3. I submit this Declaration pursuant to a Court Order dated March 5, 2024.
4. I had the misfortune of retaining the service of Defendants Liane Fisher, Michael J. Taubenfeld, and Fisher Taubenfeld, LLP ("Defendants") in or around December 2016.
5. I retained them to help me with a dispute that I had with my previous employer.

**Liane Fisher:**

6. Liane Fisher stands out as the most unethical attorney I have ever encountered in my lifetime. Her failure to promptly file a third-party complaint for contribution in my employer arbitration case resulted in the loss of over one million dollars of my money.
7. Throughout her legal representation in my case against my former employer, Liane Fisher engaged in numerous unsolicited and inappropriate conversations with me.
8. During my visits to Liane Fisher's office, she predominantly focused on discussing her marital issues and impending divorce rather than the legal matters at hand.
9. She disclosed to me that her husband was her sole intimate partner, a detail that left me perplexed as to why she felt compelled to share such personal information with me.
10. Liane Fisher mentioned that she had entered into a relationship with Jeff Brown, an attorney representing multiple women employed by my former employer. This personal revelation was one that I could have done without.

11. On one occasion, when I was in Liana Fisher's office, she was not dressed in her normal business attire, which I was accustomed to seeing her in. She was wearing form-fitting blue jeans, a tight white tank top, and high-heeled shoes.
12. She was giddy with excitement as she bragged to me that Jeff Brown was taking her on a date.
13. She informed me that she and Jeff Brown were going to a bar in midtown Manhattan and then to dinner. She then disclosed that they had been secretly dating for some time.
14. She offered me a drink of Whisky. I accepted. After I finished the drink, she informed me that Jeff Brown had gifted it to her.
15. She warned that I better not say anything because her co-counsel Taubenfeld would be upset if he knew. Taubenfeld was not in the office at the time of this meeting.
16. At the time, I thought all of this was unacceptable and highly suspicious, as Jeff Brown was the attorney for two women who wrongfully accused me of harming them.
17. I soon discovered that Liane Fisher had been carelessly sharing the intricate details of my case with Jeff Brown without my authorization.
18. Following her discussions with Jeff Brown, Liane would send me text messages recounting those conversations, knowingly and recklessly violating my rights to attorney-client privilege.
19. The situation escalated to the point where she would call me to relay information about settlement offers being provided by Jeff Brown. For instance, she mentioned that Jeff Brown had proposed a settlement of 1 million dollars with my former employer. While I found this development perplexing, Liane Fisher dismissed my concerns, claiming it was standard practice. Despite my doubts, I chose to maintain our attorney-client relationship.
20. Feeling powerless as a client, I depended on Liane Fisher to advocate for my best interests, yet she appeared preoccupied with her personal affairs.
21. It wasn't until after my professional relationship with Liane Fisher concluded that I discovered my rights as a client had been infringed upon, following consultations with several other attorneys.
22. Liane Fisher raised her voice at me when I questioned the discrepancy in attorney's fees, as she received $700,000 while I received around $300,000, despite our retainer agreement specifying a 1/3 contingency. This resulted in her taking 2/3 of my money.

23. Upon challenging the financial calculations, Liane Fisher became agitated, justifying her actions by claiming she had carried out the work and required the funds. Subsequently, she abruptly ended our conversation, hung up on me, and refused further calls.

24. There were instances when I felt like she was using me as her personal therapist.

### My Children:

25. My attorney, Tyrone Blackburn, relayed to me that during the conference on March 4, 2024, Liane Fisher's legal representative falsely asserted that Liane Fisher's children and my children were part of the same sports team and played together.

26. To clarify, my children have never met Liane Fisher, nor have they ever encountered Liane Fisher's children.

27. I am the owner of a youth basketball academy where I coach and train young athletes. The children in my program are like my own.

28. I am familiar with all the children in my program as well as their parents. Liana Fisher, along with her husband or ex-husband and their children, are not affiliated with my sports program.

29. It is disheartening that Liane Fisher and her lawyer would provide false information on the record to the court during a hearing, especially when the truth is easily verifiable. This incident is another illustration of her unethical conduct.

### The Scheinman Arbitration:

30. According to my legal representative, Tyrone Blackburn, during the conference on March 4, 2024, Liane Fisher's attorney falsely claimed that we had traveled together at least 14 times from New Jersey to New York for the Scheinman Arbitration. This assertion is completely false.

31. I have never traveled with Liane Fisher, shared a vehicle with her, or had her in my vehicle.

32. If Liane Fisher claims that we traveled together using public transportation, that statement is also completely false. I drive to all my destinations.

33. Liane disappointed me in every possible manner, divulging details of her personal life and repeatedly mentioning how her actions might anger Michael, repeatedly saying "he would kill me if he finds out". During my deposition, she failed to deliver on the preparation we had discussed in our meetings. Similar unprofessional behavior was observed with Maria

Vasques, where Liane's line of questioning necessitated intervention and correction by the arbitrator on multiple occasions.

34. Throughout the case, I repeatedly inquired why I couldn't file a complaint or a counterclaim against the entertainers, as I believed they were lying and tarnishing my reputation. Similar concerns were raised about the hosts, but my requests were consistently ignored, and I received evasive responses.

35. Despite the contradictory testimonies of all the dancers alleging sexual harassment, my attorneys never directly confronted these inconsistencies to fully discredit them. Instead, they reassured me not to worry and assured me that we had all the necessary information.

36. One of the most concerning issues was Liane's delay in preparing me for my direct examination. Despite my advance request and emphasis on the importance of this preparation, she failed to do so in a timely manner. I stressed to her that this day could be one of the most crucial in my life, and I wanted to ensure there was no doubt about my truthfulness in the eyes of the arbitrator.

37. However, she abruptly ended our preparation session because she was unprepared and ultimately ran out of time. She handed me a physical copy of the direct examination and reiterated not to inform Michael, as he would react strongly. This added to my anxiety and raised doubts on a significant day, knowing that she was being deceitful to her partner and unprepared at the same time.

38. Finally, and most significantly, she did not pose the questions to me in the manner we had prepared, which made it feel like she was attempting to trap me.

39. During the questioning, she was so off, and the arbitrator posed a line of questions. In the question by Mr. Scheinman, the focus was not on the false sexual harassment claims, but rather on whether I demanded tips from the dancers. I responded negatively, explaining that while tips were expected due to the business culture, I did not demand them. Liane later informed me that my response had undermined my credibility as a witness.

40. Her direct examination or cross-examination of Paloma was a fiasco, requiring the arbitrator to intervene and instruct her on the proper questioning format.

### Liana Fisher Place of Residence:

41. According to my legal counsel, Tyrone Blackburn, Liane Fisher's attorney mentioned during the conference on March 4, 2024, that I was aware of Liane Fisher living close to my residence in New Jersey. This claim is entirely untrue.
42. Liane Fisher has never disclosed her place of residence to me. I have never visited Liane Fisher's home, and she has certainly never been to my residence.
43. I have never had the opportunity to meet Liane Fisher's husband. She has met my wife only during her depositions in my case.
44. Every encounter I had with Liane Fisher took place in New York City. She shared with me that she lived "in the city."
45. Additionally, she mentioned her intention to buy a home after finalizing her divorce from her husband, in NY or NJ.
46. I relayed this detail to my attorney, Tyrone Blackburn. After conducting his investigation, he informed me that he found information through a legal channel indicating that she resides in New York City. I had no grounds to doubt the accuracy of his findings or to assume that Liane Fisher resided elsewhere.
47. As mentioned earlier, I have never been to her residence, and she has never visited mine.

### Liane Fisher Intentionally Misled Me:

48. Liane informed me that Jeff Brown was not pursuing legal action against me, but rather against higher management, and that they could collaborate on the case. I was puzzled by how he obtained such detailed information.
49. I do not think she was serious about being an attorney, as she had expressed her ambition to become an arbitrator.

### My Case File:

50. For over a year, I have sent emails and text messages to Michael J. Taubenfeld and Fisher Taubenfeld, LLP, asking them to turn over my case file. To this date, they have not. According to the rules of professional conduct, I am entitled to a copy of my legal file from them.
51. I ask that this court issue an order requiring them to turn over my client file within two weeks.

52. They have unethically stolen my money and caused me over 1 million dollars of losses due to their malpractice. They have intentionally and deliberately ignored my request for my complete client file and have delayed my ability to seek recourse to try and explore any possible avenues that I could take to reverse their mistakes.
53. I am desperate to get my files from them, so I am respectfully pleading with the Court for help.

I declare under penalty of perjury that the preceding is true and correct.

Executed on March 19, 2024

*Aleksandar Zunzurovski (Mar 19, 2024 20:05 EDT)*

Aleksandar Zunzurovski